

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,025

### OBEL CRUZ-GARCIA, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 1384794 IN THE 337th DISTRICT COURT
### HARRIS COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, JOHNSON, KEASLER, ALCALA, RICHARDSON and YEARY, JJ., joined. HERVEY and NEWELL, JJ., concurred.

In June 2013, appellant was convicted of capital murder and sentenced to death.[1] Direct

---

[1] TEX. PENAL CODE § 19.03(a)(2); TEX. CODE CRIM. PROC. art. 37.071. Unless otherwise indicated, all future references to articles refer to the Code of Criminal Procedure.

appeal to this Court is automatic.[2]  Appellant raises twelve points of error.  Finding no reversible error, we affirm the conviction and sentence.

## I. Background

On September 30, 1992, two masked intruders broke into an apartment shared by Arturo Rodriguez, Diana Garcia, and Diana Garcia's six-year-old son, Angelo Garcia, Jr.  Diana was awakened by a loud sound coming from her living room.  Her husband, Arturo, walked toward the sound but was quickly met by a large male wearing a mask and pointing a gun at him.  Both Diana and Arturo testified that this man spoke to them, but neither could understand him because he spoke in an unknown accent.  Additionally, they both described the man as "black" or dark-complexioned.  When the initial responding officer made his report about this case, he described Diana's and Arturo's assailants as "black" but testified at trial that he meant "black Hispanics."

The masked man instructed Diana to turn face down on her bed and then began beating Arturo.  After Diana complied with the instruction to lie face down, a second man entered the room holding a gun, and one of the intruders tied up Diana.  Arturo was tied up with the cord from his alarm clock, a rag was put in his mouth, and he was beaten on his head with a gun while he knelt by his bed.  At this point, Angelo, who had been sleeping on a pallet by the bed, began crying out for Diana.

The second intruder then started touching Diana on her buttocks, turned her over so that she was lying on her back, and put a blanket over her face.  The second intruder removed Diana's panties and sexually assaulted her.  Diana testified that the assailant ejaculated during the sexual assault. Arturo testified that he saw an unknown male sexually assaulting his wife before the other assailant

---

[2]  Art. 37.071, § 2(h).

placed a pillowcase over his head. All the while, Angelo was present in the room and crying.

Once the sexual assault ended, the two men ransacked the bedroom and then left. Arturo testified that his passport and a bracelet were missing after the incident. After the men left, Diana got up and untied Arturo's hands. Diana and Arturo then noticed that Angelo was missing and walked into their living room to look for him. Upon entering their living room, they saw the first, tall, masked intruder returning to the apartment. When Diana and Arturo saw this man, they turned and walked back into their bedroom, and the masked man turned and left the apartment.

After both intruders left, Diana and Arturo left their apartment and began looking for Angelo. They called out his name at their own apartment complex and across the street but received no response. At some point, Diana's neighbor called 911. Houston Police Department ("HPD") responded to a 911 call claiming that a child had been kidnapped from Diana and Arturo's apartment. Upon arriving, officers found Arturo injured and Diana distraught. An inspection of the apartment revealed the bedroom to be in disarray, with drawers pulled out of dressers and items of clothing strewn about. Officers found a cigar in the living room, although at trial both Diana and Arturo testified that neither one of them smoked.

Police officers interviewed Diana and Arturo on-scene and asked them whether they sold drugs. Both were untruthful. Diana was transported to a hospital for a sexual assault examination. A Sexual Assault Nurse Examiner (SANE), Gloria Kologinczok, testified that she performed a sexual assault examination on Diana Garcia during the early morning hours of October 1 and produced a sexual assault kit containing evidence from Diana.

On October 1, 1992, police interviewed Diana at the police station, and she came clean about her and Arturo's drug dealing. She also told police that appellant was her drug supplier until

recently, when she and Arturo had told appellant that they no longer wanted to sell drugs for him. Officer U.P. Hernandez interviewed both Diana and Arturo. Arturo testified that, when he spoke to police, he never lied about his drug dealing, but Officer Hernandez testified to the contrary.

During their investigation, officers also met with or interviewed Leonardo German (friend of Diana and Arturo), Rogelio Rendon, Carmelo Martinez Santana[3] (also known as "Rudy;" friend of appellant), and Angelita Rodriguez (appellant's wife).

At trial, Diana and Arturo both testified about their relationship with appellant. Arturo and Diana sold cocaine for appellant for several years when all three lived in Houston. They also associated socially with appellant and his wife, Angelita, on several occasions. Arturo testified that he considered his relationship with appellant to be a friendly one, and Diana testified that Angelita was her friend. A few months prior to Angelo's kidnapping, Arturo and Diana told appellant they no longer wanted to sell drugs for him, and Arturo testified that this upset appellant.

Angelita also testified about her relationship with appellant. Her cousin, Rudy, was good friends with appellant, and the three of them moved to Houston from Puerto Rico around the same time in 1989. Angelita and appellant shared an apartment in Humble, a suburb of Houston. Angelita testified that appellant smoked both cigarettes and cigars and that he owned a gold Oldsmobile and a blue Thunderbird. Angelita met Diana and Arturo through appellant because of appellant's drug dealing.

Angelita learned of Angelo's disappearance on the news on the afternoon of October 1. Upon hearing of his disappearance, she immediately approached appellant in their apartment and told

---

[3] Several witnesses are referred to throughout the record by their nicknames. We will do the same.

him that Angelo had gone missing. Angelita told appellant she wanted to go see Diana and Arturo, but he refused to go with her. Angelita testified that appellant seemed calm and "normal" upon hearing the news that Angelo had disappeared, despite the fact that Diana and Arturo were their friends and their child had gone missing. Appellant then told Angelita that he was leaving Houston for Puerto Rico immediately and began to pack his bags.

Angelita testified that, due to his sudden departure from Houston, appellant missed a scheduled court date. He had never missed one prior to that. After appellant left for Puerto Rico, Angelita could not afford to continue paying rent in their Humble apartment, so she moved to a hotel in Pasadena. Some time later, Angelita went to the Dominican Republic, where appellant was then living, to ask him for a divorce. Appellant refused. Angelita then asked him about Angelo, and appellant confessed to her that he had killed him.

Rudy, Angelita's cousin, testified that he met appellant when they were both living in Puerto Rico, prior to their initial move to Houston. Both are originally from the Dominican Republic. Rudy and appellant moved to Houston to sell drugs in the late 1980s, and Angelita followed them shortly thereafter. Rudy and appellant worked together selling drugs until Rudy's drug addiction became too severe for him to continue dealing. At that point, appellant took over the operation. Rudy testified that appellant was a violent, angry, and controlling person. Once when appellant thought Rudy was stealing drug customers from him, he assaulted Rudy and threatened to kill him.

Rudy testified that appellant owned three cars: a blue Chevrolet, a blue Thunderbird, and a gold Oldsmobile. Appellant routinely lent the Oldsmobile to Bienviendo Melo (also known as "Charlie"). On September 30, appellant drove his blue Chevrolet to Diana and Arturo's apartment to collect his drugs and money. Rudy and Rogelio Aviles (also known as "Roger") went with him.

Rudy described Roger as tall, strongly built, and dark-complexioned. Appellant parked his car behind Diana and Arturo's apartment complex and instructed Rudy to sit in the passenger seat while he and Roger went inside. Appellant took a .45 caliber pistol with him, Roger carried a knife, and both appellant and Roger wore black stocking masks.

Approximately thirty minutes after appellant and Roger left the car, appellant came back with a child in his arms. Rudy recognized the child as Angelo Garcia, Jr. When Rudy asked why appellant was carrying Angelo, appellant responded, "He saw me."

Rudy tried to persuade appellant to retrieve Diana to care for Angelo. Appellant left the car for the apartment again, leaving Angelo with Rudy, but returned with Roger instead of Diana. When appellant returned, he told Rudy to sit in the back seat with Angelo. Appellant maintained a grip on his gun while he drove Rudy, Angelo, and Roger to Baytown. Appellant stopped the car not far into Baytown, and all three men exited the car. Rudy testified that by this time he was very scared and had grown convinced appellant was going to kill Angelo.

Appellant told Roger, "You already know what you have to do." Rudy testified that he walked away from the two other men and then became ill, defecating nearby. As Rudy was walking away, he heard Angelo scream. Rudy returned to the car where he saw Angelo with blood on his chest. Appellant ordered Rudy and Roger to put Angelo's body in the backseat, and they complied.

Appellant drove them to another location in Baytown near a waterway and ordered Rudy and Roger to put Angelo's body in the water. The two men once again complied. Rudy and Roger piled rocks on top of Angelo's body to make it sink. Rudy testified that appellant had his gun with him the entire time. The three men then left Baytown and drove to Pasadena. On their way there, several of their tires blew out.

They managed to make it to a hotel where appellant made Rudy and Roger swear they would never tell what had happened to Angelo. At the hotel, the men attempted to make other transportation arrangements by calling Charlie. Appellant, Rudy, and Roger eventually went to Charlie's apartment in a taxi, where they retrieved appellant's car. There, Rudy saw Charlie and his girlfriend, Linda.

Linda also testified about appellant's phone call to Charlie. In the early morning hours of October 1, 1992, Linda and Charlie were staying together at Linda's mother's house when they received several phone calls from appellant. Linda and Charlie were both familiar with appellant because Charlie sold drugs for appellant. Linda described appellant as controlling.

When Charlie finally answered the phone around 2:00 a.m., appellant asked Charlie to pick him up. Charlie declined. Approximately thirty minutes later, appellant and Rudy appeared at Charlie's house to borrow a car. Linda testified that, while Rudy appeared nervous, appellant did not. After October 1, 1992, Linda never saw appellant again. Prior to that date, appellant visited Linda and Charlie's residence several times a week.

Later in the day on October 1, Rudy and appellant took appellant's blue Chevrolet to Rendon's Garage to have the tires changed. At this time, appellant told Rudy that appellant was leaving Houston. Rudy helped appellant wash Angelo's blood and vomit from the interior of the car. Appellant then sold the car and used the money to buy a plane ticket to Puerto Rico. Rudy drove appellant to the airport the following day, October 2, 1992, and he did not see appellant again until they both returned to Houston for appellant's capital murder trial.

Agent William Ebersole testified that he interviewed Rudy while Rudy was in a federal prison in Pennsylvania. Agent Ebersole obtained a statement from Rudy about what happened the

night of September 30, 1992, and about appellant's involvement in Angelo's murder.

On cross-examination of both Rudy and Agent Ebersole, defense counsel highlighted inconsistencies between Rudy's trial testimony and the statement he gave to Agent Ebersole while imprisoned. Rudy omitted from his story to Agent Ebersole any reference to him defecating while Angelo was being killed. Rudy told Agent Ebersole that he was familiar with the Baytown area because he had sold drugs there prior to September 30, 1992, but Rudy denied this at trial. Rudy told Agent Ebersole that Roger took Angelo to the rear of the driver's side of the car and that is where he killed him while appellant stood near the front of the car, but this did not exactly comport with Rudy's trial testimony.

While Rudy testified at trial that appellant threatened him and ordered him not to tell anyone what the three of them did to Angelo, Agent Ebersole's notes reflected that the three merely made a pact to keep their secret. Additionally, Rudy's recollection of how long appellant and Roger were in Diana and Arturo's apartment and how many tires blew out on their car once they left Baytown was inconsistent with the recollection given to Agent Ebersole.

During their investigation into Angelo's kidnapping, local police officials learned that Diana and Arturo had rented an apartment in Humble for appellant and his wife. When HPD officers went to that apartment to look for appellant on October 5, 1992, they found it vacated. Additionally, officers learned that, prior to it being vacated, the apartment had been occupied by two "black-Hispanic males" and one light-skinned Hispanic female.

One of the men who had occupied the Humble apartment had been seen wearing a shirt from Rendon's Garage with the name Luis on it. Upon learning this, officers went to Rendon's Garage where they met with Juanita Rendon, the wife of the owner, Rogelio Rendon. Rogelio was initially

unavailable to speak with officers. Officer Hernandez returned to the garage and observed Rogelio driving up in a blue Thunderbird. Rogelio was accompanied by a man who identified himself as Candido Lebron. While Officer Hernandez was speaking with Rogelio, Angelita and Rudy came to the garage to claim the blue Thunderbird.

The next day, on October 6, HPD received a tip that a Hispanic male was seen at the Humble apartment. HPD officers returned to the apartment, knocked on the door, and were met by an individual who again identified himself as Candido Lebron. They later learned his true name was Rogelio Aviles (also known as "Roger," the third adult male with appellant and Rudy on the night of September 30, 1992). HPD officers continued to look for appellant in Houston and surrounding cities but were unable to locate him.

FBI Agent Eric Johnson testified that he became involved in the current case in 1992 because it involved the kidnapping of a child under the age of twelve. The FBI worked in conjunction with local authorities in an attempt to locate Angelo. Appellant was a suspect early on in the FBI's investigation. During his investigation, Agent Johnson learned that on October 8, 1992, appellant was set to appear in a Harris County district court on an unrelated felony drug case.

Agent Johnson testified from court documents that reflected that appellant was scheduled to appear in court on October 8, 1992, that appellant failed to appear in court on that date, and that his bond was subsequently forfeited for this failure to appear.

On the afternoon of November 4, 1992, a fisherman walking the banks of Goose Creek in Baytown discovered Angelo's body. Because of a cold front that had blown through the area, eight to ten feet of beach that was normally submerged was exposed; this is where Angelo's body was found. Baytown Police Corporal Randy Rhodes was dispatched to the waterway.

Upon arriving, he observed the skeletal remains of a small child on the sandy part of the beach. The skeleton was mostly intact, but the skull had disconnected from the torso, and some rib bones and vertebrae had been disturbed. From the same area, officers also recovered a pair of shorts with a Batman logo and a t-shirt. Diana testified that Angelo had been wearing Batman pajamas on the night he was kidnapped.

An autopsy was performed on Angelo's remains in 1992 by Dr. Vladimir Parungao. Dr. Parungao was no longer employed by the Harris County Institute of Forensic Sciences at the time of trial, so Harris County Deputy Chief Medical Examiner, Dr. Dwayne Wolf, testified at trial. After reviewing photographs and Angelo's autopsy report, Dr. Wolf testified that Angelo's manner of death was homicide and that his body appeared in a state that was consistent with it having been submerged for several weeks. The fact that Angelo was abducted, that his body was found in an advanced state of decomposition, and that his body was found many miles from his home all contributed to Dr. Wolf's opinion that Angelo was murdered.

Dr. Wolf also examined the clothing found near Angelo's body and testified that any blood that may have been on the clothing would have washed away after the clothing was submerged in water. On cross-examination, Dr. Wolf confirmed that he did not find any injuries to any of Angelo's bones and that he could not rule out drowning as a cause of death.

DNA evidence was also presented at trial. Sergeant Eric Mehl worked in the cold case division of HPD in 2007 when this case was reopened. As part of his investigation, Sergeant Mehl submitted several pieces of evidence to a private forensics lab called Orchid Cellmark[4] for DNA testing. Sergeant Mehl sent the cigar that was collected from the crime scene, Diana's sexual assault

---

[4] Orchid Cellmark was called "Cellmark Forensics" at the time of trial.

kit, and a cutting from the pair of panties Diana was wearing the night of her sexual assault. The cutting from Diana's panties was a cutting from the crotch area. From that cutting, Orchid Cellmark cut away a small piece on which they performed their testing. Orchid Cellmark developed an unidentified male DNA profile from these pieces of evidence.

Matt Quartaro, a supervisor of forensics at Orchid Cellmark, testified about the DNA testing his lab performed after it received evidence from Sergeant Mehl. After testing the cigar, Orchid Cellmark was able to generate a full DNA profile of an unknown male. This profile was compared to the profiles of Diana and Arturo, but it did not match either of them.

Orchid Cellmark also tested vaginal swabs from the sexual assault kit. The vaginal swabs contained a mixture of epithelial cells and sperm cells. The epithelial cells belonged to Diana, and the sperm cells belonged to more than one male individual. Arturo could not be excluded as a contributor to the sperm-cell fraction from the vaginal swab. Additionally, the unknown male whose DNA was found on the cigar could not be excluded as a contributor to the sperm-cell fraction from the vaginal swab.

When Orchid Cellmark tested the portion of the panties they had received, they once again found Diana's epithelial cells and a sperm-cell fraction with more than one contributor. The unknown male from the cigar DNA sample could not be excluded as a major contributor to the sperm sample in the panties. Additionally, Arturo could not be excluded as a contributor to that sperm sample.

Later, in December 2007, Orchid Cellmark received DNA samples from Roger, Charlie, Leonardo German, and Rudy to compare to the DNA profiles they had obtained from the cigar, sexual assault kit, and panties. Roger, Charlie, and Leonardo were all excluded as contributors to

any of the DNA evidence found on the cigar, sexual assault kit, and panties.

The first sample received from Rudy was not sufficient to compare to the DNA profiles Orchid Cellmark had obtained. In June of 2011, Orchid Cellmark received a second DNA sample from Rudy and at that time was able to exclude him as a contributor to any of the DNA on the evidence that Orchid Cellmark tested.

In early 2008, Sergeant Mehl learned that appellant was in Puerto Rico. Sergeant Mehl, working in conjunction with the FBI in Puerto Rico, obtained a DNA sample from appellant on May 23, 2008. He then sent that DNA sample to Orchid Cellmark. On May 28, 2008, Orchid Cellmark received a sample of appellant's DNA. The sample arrived in a sealed envelope with appellant's name written on it.

Appellant's DNA matched the profile that had been obtained from the cigar found in Diana and Arturo's apartment in September of 1992. Additionally, appellant's DNA could not be excluded as a contributor to the unknown male profile found on the vaginal swabs from Diana's sexual assault kit. Lastly, appellant's DNA matched the unknown male profile that was the major contributor to the DNA in the sperm-cell fraction from Diana's panties.

Quartaro also discussed the quality-control procedures in place at Orchid Cellmark to prevent contamination of the evidence they receive and the profiles they obtain. Quartaro acknowledged that Orchid Cellmark cannot implement or monitor quality-control procedures at other labs. But on redirect, Quartaro testified that none of the evidence that he received appeared to be contaminated. All the evidence appeared to be in good condition; it was packaged separately to prevent cross-contamination, and all containers were sealed. Quartaro also testified that it would be impossible to contaminate a sample in such a way that appellant's DNA would appear on that sample unless the

contaminator had some of appellant's DNA.

Moreover, Quartaro testified that cross-contamination between the cigar and the sexual assault kit or panties was not possible because appellant's epithelial cells were found on the cigar, while appellant's sperm cells were found on the swabs from the sexual assault kit and the panties. Additionally, no epithelial cells belonging to appellant were found in the samples from the sexual assault kit or panties.

The Houston Police Department Crime Lab was also involved in DNA analysis in the instant case. Courtney Head, an analyst from the crime lab, testified that in February 2010 she received a known DNA sample from appellant. This sample was collected separately from the sample collected and sent to Orchid Cellmark in 2008. From this sample, Head performed her own DNA extraction to create a DNA profile. She then compared that profile to the profiles obtained by Orchid Cellmark from the cigar, the sexual assault kit, and the panties.

Appellant could not be excluded as a contributor to the male DNA profile found on the cigar and the vaginal swabs from the sexual assault kit. Additionally, appellant could not be excluded as the major contributor to a male DNA profile in the sperm-cell fraction obtained from Diana's panties. Head testified that, to a reasonable degree of scientific certainty, appellant was the source of the DNA profile on the cigar and the panties.

Pursuant to his cold case investigation, Sergeant Mehl interviewed Diana, Arturo, Linda Hernandez, and Angelita Rodriguez. A Spanish-speaking officer interviewed Rudy. Sergeant Mehl attempted to locate Charlie for an interview but was unable to find him. At the conclusion of his investigation, Sergeant Mehl filed charges against appellant. Appellant was later tried and convicted of capital murder and sentenced to death.

## II. Guilt

*A. Sufficiency of the Evidence*

In his third point of error, appellant challenges the sufficiency of the evidence to support his conviction for capital murder. Appellant highlights the following areas in which he claims the evidence is insufficient: Rudy's credibility and motive to testify, Diana's and Arturo's descriptions of their intruders, Diana's and Arturo's dishonesty about their drug dealing, Angelita's potential ulterior motive to testify against appellant, whether a sexual assault or consensual sexual encounter occurred, the chain of custody for the forensic evidence, and Angelo's cause of death. We review these complaints specifically, in addition to reviewing the totality of the evidence supporting appellant's conviction.

This Court does not engage in a factual-sufficiency review. Instead, we engage only in the legal-sufficiency review enunciated in *Jackson v. Virginia.*[5] In so doing, we review the entire record in the light most favorable to the verdict to determine whether any rational fact-finder could have found the elements of the offense beyond a reasonable doubt.[6] If a rational fact-finder could have so found, the verdict will not be disturbed on appeal.[7]

Here, appellant was convicted of capital murder, having intentionally or knowingly caused

---

[5]  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). *See also Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (holding that the relevant inquiry for appellate courts reviewing the sufficiency of the evidence to support a conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original)).

[6]  *Jackson*, 443 U.S. at 319.

[7]  *See id*. at 319 (upholding conviction where evidence was legally sufficient). *See Temple v. State*, 390 S.W.3d 341, 363 (Tex. Crim. App. 2013) (affirming judgment because evidence was legally sufficient to support a conviction).

the death of another during the course of committing a kidnapping.[8] Circumstantial evidence is just as probative as direct evidence in establishing guilt.[9] Every piece of circumstantial evidence need not point directly to appellant's guilt.[10] Instead, we examine the cumulative effect of all the evidence when determining whether such evidence is sufficient to sustain a conviction.[11]

Further, we permit juries to draw reasonable inferences from the facts they are presented, so long as their inferences are supported by the evidence adduced at trial.[12] After a thorough review of the record, we conclude that the evidence is sufficient to support appellant's conviction.

*1. Appellant's Specific Sufficiency Complaints*

The jury heard testimony from twenty witnesses, including Diana Garcia, Arturo Rodriguez, and Rudy. Although appellant attacks the credibility of these three witnesses in particular, all credibility determinations are solely within the province of the jury.[13] The jury is the sole judge of credibility and of the weight to be attached to the testimony of witnesses.[14]

The jury was free to believe Rudy's account of September 30, 1992, at trial and disregard any inconsistencies with previously-made statements. Rudy's testimony presented compelling evidence of appellant's direct involvement in the kidnapping and killing of Angelo. Rudy's testimony about

---

[8] *See* TEX. PENAL CODE § 19.03(a)(2).

[9] *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

[10] *Hooper*, 214 S.W.3d at 13.

[11] *Id.*

[12] *Temple*, 390 S.W.3d at 360; *Hooper*, 214 S.W.3d at 15.

[13] *Temple*, 390 S.W.3d at 363.

[14] *Id.* at 360.

the events of September 30, 1992, was corroborated by Diana's and Arturo's accounts that two masked men entered their apartment and left with their child and by the location where Angelo's body was discovered. Appellant also highlights the fact that Rudy was in federal prison when he was first approached by law enforcement officers during their cold case investigation into Angelo's death. This fact goes to Rudy's credibility, a determination left to the jury.

Additionally, the jury was free to find credible Diana's and Arturo's testimony, despite evidence of previous dishonesty or inconsistent testimony about the disclosure of their drug dealing. Diana testified that two masked men broke into her apartment, that one sexually assaulted her, and that when they left, her child was gone. Diana's testimony was corroborated by Rudy's testimony that appellant and Roger, while wearing masks, went to Diana and Arturo's apartment to retrieve their drugs and money and left that apartment with Angelo.

Further, Diana's claim that she was sexually assaulted on the night in question is corroborated by the DNA results from the evidence in her sexual assault kit. Diana testified that she and appellant had never had a consensual sexual relationship, yet appellant's DNA was found in sperm from vaginal swabs obtained the night that Diana claims she was sexually assaulted.

Appellant also complains that the evidence is insufficient to support his conviction because of the descriptions Diana and Arturo gave the police of their intruders. Diana, Arturo, and various police officers testified that Diana and Arturo both described their intruders as "black." Appellant is not African-American and therefore contests the applicability of this description to him.

At trial, however, numerous witnesses testified that Mexican Hispanics routinely use the descriptor "black" to describe dark-complexioned Hispanics who are not from Mexico. The jury was free to believe this explanation and could reasonably infer from the testimony they heard that Diana

and Arturo were describing dark-complexioned Hispanic males, not African-American males.

Appellant also contests Angelita's motive to testify and claims her testimony was untrustworthy. But Angelita's credibility was for the jury alone to decide. Angelita testified that appellant was a drug dealer who sold drugs to Diana and Arturo. On October 1, 1992, the night after Angelo was abducted, appellant abruptly told Angelita he was moving back to Puerto Rico and expressed no concern over Angelo's abduction, despite appellant's friendship with Diana and Arturo. Angelita's testimony as to appellant's flight presented circumstantial evidence of appellant's guilt, and the jury was free to believe that testimony and draw reasonable inferences regarding appellant's guilt therefrom.

Appellant complains that there was insufficient evidence of the chain of custody of the forensic evidence admitted by the State. Absent a showing of tampering, discrepancies in the chain of custody go to the weight to be given a piece of evidence, not its admissibility.[15] The jury is the sole decider of the weight to be given a piece of evidence.

Here, the jury heard testimony that the forensic evidence at issue was stored in sealed plastic bags. Quartaro testified that, when he received the evidence for testing, he observed no signs of tampering or contamination. The jury was free to lend credence to Quartaro's examination of the evidence and the state it was in based on his training and experience and disregard implications from defense counsel that the evidence had been compromised.

Lastly, appellant complains of insufficient evidence to support a determination that Angelo was murdered. But the jury heard evidence from Dr. Wolf, the Deputy Chief Medical Examiner in Harris County, that, based on all the circumstances surrounding the case, he believed Angelo's death

---

[15] *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997).

to be a homicide. Dr. Wolf's testimony, combined with the circumstances surrounding Angelo's kidnapping and the discovery of his body, was sufficient for a rational juror to determine that Angelo had been murdered. The jury was free to believe Dr. Wolf's testimony and disregard evidence to the contrary.

Appellant also alludes to an argument that there was insufficient evidence for a fact-finder to determine Angelo came to his death "as alleged in the indictment." But here, the State alleged two separate manner and means for how Angelo died: first, that Angelo was stabbed to death, and second, that Angelo died by unknown means. Rudy's testimony provided sufficient evidence, if believed, that Angelo was stabbed to death. Dr. Wolf's testimony provided sufficient evidence, if believed, that at the very least, Angelo was murdered, even if the particular manner and means were unknown.

It was within the purview of the jury to lend credence to the testimony of Rudy and Dr. Wolf about how Angelo died. Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence to support the jury's verdict that Angelo died at the behest of appellant, in a manner alleged in the indictment.

*2. Other Evidence Supporting Appellant's Conviction*

Beyond appellant's specific sufficiency complaints, we hold that there is sufficient evidence in the record for a rational trier of fact to find every element of capital murder beyond a reasonable doubt. Appellant knew Diana and Arturo through his drug business. When Diana and Arturo withdrew from appellant's drug business, appellant became upset with them. Shortly thereafter, two dark-complexioned males broke into Diana and Arturo's apartment on the night of September 30, 1992, and assaulted Arturo and sexually assaulted Diana. A sexual assault examination was

performed on Diana that very night and a sexual assault kit was created with the biological material collected. Subsequent DNA testing revealed that that evidence contained sperm from appellant.

Rudy testified that he saw appellant carry Angelo from Diana and Arturo's apartment to their car on the night of September 30, 1992. Appellant then drove to a remote area of Baytown where he ordered Roger to kill Angelo. Rudy saw Angelo's body lifeless and covered in blood immediately after this order and helped Roger dispose of the body in a nearby waterway while appellant looked on.

One day later, on October 1, 1992, appellant told his wife, Angelita, that he was leaving Houston to return to Puerto Rico. Angelita testified that this trip was sudden and unplanned. Appellant cleaned out the interior of the car he had been driving on September 30, sold the car, and used the proceeds to purchase a plane ticket to Puerto Rico. The next time Angelita saw appellant was in the Dominican Republic, when he confessed to her that he had killed Angelo.

Appellant was scheduled to appear in a Harris County district court on October 8, 1992, on a pending drug case. Appellant failed to appear on that date and subsequently forfeited his bond. Appellant had been present at every court setting prior to the October 8 setting. In November 1992, Angelo's body was found in a waterway in Baytown, and Rudy testified that he and Roger had left Angelo's body in a Baytown waterway a month prior. We conclude that the evidence is sufficient to support appellant's conviction for capital murder. Appellant's third point of error is overruled.

*B. Motion to Suppress*

In his first point of error, appellant contends that the trial court denied him due process when it denied his motion to suppress DNA and other forensic evidence that had been stored by the "old" Houston Police Department Crime Lab ("old HPD crime lab"). We review a trial court's ruling on

a motion to suppress under a bifurcated standard of review.[16]  We afford almost total deference to the trial court's determination of historical facts and mixed questions of law and fact that turn on the evaluation of credibility and demeanor.[17]  Questions of law and mixed questions of law and fact not turning on credibility are reviewed de novo.[18]  We will not disturb the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case.[19]

At the hearing on appellant's motion to suppress, appellant argued against the admission of forensic evidence that had been stored by the old HPD crime lab.  Specifically, the pieces of evidence to which appellant objected were (1) a cigar found at the crime scene, (2) a sexual assault kit performed on Diana Garcia on the morning after Angelo was kidnapped, and (3)  a cutting from the pair of panties Diana wore the night of the instant offense.

Appellant also argued against the admission of results from DNA testing performed on the cigar, sexual assault kit, and panties, despite the fact that the proffered test results were not generated by the old HPD crime lab.  In support of his motion, appellant argued that the mere fact that the forensic evidence at issue had been stored by HPD, and subsequent to that storage the old HPD crime lab was shut down because of quality-control problems, provided sufficient indicia that the evidence had been contaminated and was therefore untrustworthy to put before a jury.

The State countered with testimony from three witnesses.  First, Eric Mehl, a retired police sergeant, testified that he had worked on appellant's case as a member of the cold case squad in the

---

[16]  *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[17]  *Id.*

[18]  *Id.*

[19]  *State v. Ross*, 32 S.W.3d 853, 855-56. (Tex. Crim. App. 2000).

homicide division of the Houston Police Department. Pursuant to that role, in October 2007, Sergeant Mehl obtained the cigar and sexual assault kit that had been collected as evidence in 1992. At the time it was retrieved, the cigar was being stored in the HPD property room on Goliad Street. The sexual assault kit was being stored in the property room annex on the 24th floor on Travis Street. Both the cigar and the sexual assault kit were sealed in separate plastic bags. Sergeant Mehl testified that both pieces of evidence appeared to be in good condition and neither appeared to have been damaged.

On October 2, 2007, Sergeant Mehl shipped the cigar and sexual assault kit to Orchid Cellmark, a private forensics lab that contracted with HPD, for testing. Subsequently, Sergeant Mehl obtained the cutting of the crotch from the panties that had belonged to Diana, a biological sample from Diana, and a biological sample from Arturo, that had all been stored in the crime lab. Each piece of evidence was stored separately in its own sealed plastic bag. Additionally, Sergeant Mehl obtained stored blood samples of various known associates of appellant.

On May 23, 2008, Sergeant Mehl received a sample of appellant's DNA after Mehl's colleague, Sergeant Stephens, informed Mehl that appellant was in custody in Puerto Rico. An FBI agent in Puerto Rico obtained appellant's DNA sample and sent that sample to Sergeant Mehl. Sergeant Mehl did not open the package containing appellant's DNA sample but instead repackaged it and shipped it to Orchid Cellmark for comparison with the evidence already in its possession.[20]

At the time Sergeant Mehl sent appellant's DNA sample to Orchid Cellmark, Orchid

---

[20] While the record is clear that Sergeant Mehl sent the cigar and sexual assault kit to Orchid Cellmark on October 2, 2007, the record is unclear as to when Sergeant Mehl sent the panties and the known DNA samples from Diana, Arturo, and appellant's associates. Sergeant Mehl testified only that, by the time he obtained appellant's DNA sample from Puerto Rico (May 23, 2008), he had already sent "all of the original evidence that might contain biological material" to Orchid Cellmark.

Cellmark already had all the original evidence that potentially contained biological material. Later, Sergeant Mehl received the results of Orchid Cellmark's testing and comparison. After learning of Orchid Cellmark's results, Sergeant Mehl arrested appellant for capital murder.

Second, the State called Matt Quartaro, a supervisor at Orchid Cellmark. Quartaro testified to his qualifications and to the procedures he employs when he analyzes DNA evidence. Orchid Cellmark received evidence connected to appellant's case on October 3, 2007. The evidence arrived in a sealed box. Within the box were several manilla envelopes and within those envelopes were sealed plastic bags, each containing an individual piece of evidence. Quartaro testified that nothing appeared to have been tampered with or contaminated.

Ultimately, Orchid Cellmark took possession of the cigar, the sexual assault kit, Diana's panties, DNA extractions that had already been performed on several pieces of evidence, and the known DNA samples from Angelo's family and appellant's associates. Instead of relying on the existing DNA extractions it received, that were generated by the old HPD crime lab, Orchid Cellmark performed its own DNA extractions and analyses on the panties, the cigar, and the vaginal swabs from the sexual assault kit.

An unknown male DNA profile was found on the cigar. That DNA profile could not be excluded as a contributor to an unknown male DNA profile from sperm found on a vaginal swab in the sexual assault kit. Additionally, an unknown male DNA profile was discovered on the panties that was consistent with the unknown male DNA profile found on the cigar and the vaginal swab.

The DNA on the cigar was single-source; only one individual's DNA was present. The vaginal swab contained Diana's epithelial cells, Arturo's DNA in the form of sperm cells, and an unknown male contributor's DNA, also in the form of sperm cells. This unknown male profile

matched the profile obtained from the cigar. Diana's epithelial cells were also found on her panties along with sperm from two contributors. The major contributor to the sperm-cell fraction in the panties matched the unknown male DNA profile found on the cigar. Arturo, Diana's husband, could not be excluded as the minor contributor to the sperm-cell fraction in the panties.

On May 28, 2008, Orchid Cellmark received a sample of appellant's DNA. From that sample, it obtained a full DNA profile for appellant, which matched the DNA profile found on the cigar and the major contributor profile obtained from the sperm-cell fraction of the panties. Appellant could not be excluded as a contributor to the sperm-cell fraction from the vaginal swabs in the sexual assault kit. Orchid Cellmark eliminated as contributors all of appellant's associates for whom they had known DNA samples.

On the topic of contamination, Quartaro testified that without a sample of appellant's DNA in the crime lab where the evidence at issue was stored, it would be difficult to contaminate the evidence with appellant's DNA. Put another way, it is highly unlikely under existing circumstances that appellant's DNA would appear on the evidence at issue if he did not put it there himself. Quartaro also quelled fears regarding cross-contamination between the cigar and the panties or sexual assault kit because the cells containing appellant's DNA on the cigar were saliva and skin cells, while the cells on the panties and vaginal swabs were sperm cells.

Finally, Quartaro noted that contamination from excess moisture, heat, or other environmental factors would manifest itself as a degradation of the biological sample found on a particular piece of evidence. Such contamination would not result in the manifestation of an otherwise-absent DNA profile.

Third, the State called Courtney Head, a criminalist specialist with the "new" Houston Police

Department crime lab ("new HPD crime lab").[21] Head testified to her qualifications as a DNA analyst and then testified about the involvement of Genetic Design Lab in the instant case. Genetic Design Lab is an independent, California-based lab that received DNA extractions from evidence in appellant's case in the 1990s. Head testified that her notes indicated that in 1992 the old HPD crime lab extracted DNA from evidentiary samples and sent those extractions to Genetic Design Lab for testing. There is no indication that any pieces of actual evidence, as opposed to mere extractions, were sent to Genetic Design Lab.

Head also testified to analyses she performed at the new HPD crime lab. After receiving a buccal swab from appellant, Head extracted appellant's DNA and obtained his DNA profile. Head then compared that profile to the profiles that had been generated by Orchid Cellmark from the cigar, the panties, and the vaginal swab. According to Head's tests, appellant could not be excluded as the contributor to the DNA on the cigar, appellant could not be excluded as the contributor to the major DNA profile on the panties, and appellant could not be excluded as a contributor to the DNA found on the vaginal swab in the sexual assault kit.

Appellant cross-examined all three of the State's witnesses, focusing on the time each piece of evidence spent at the old HPD crime lab. Appellant also emphasized the fact that some of the evidence at issue had even been tested by the old HPD crime lab when it first reached the lab in 1992, including one of the vaginal swabs from the sexual assault kit. Appellant argued to the trial court that the evidence was contaminated as a result of the time it spent at the old HPD crime lab.

Absent evidence of tampering, allegations or questions regarding the care and custody of a

---

[21] Some years after the closure of the old HPD Crime Lab, HPD opened a new crime lab.

piece of evidence go to the weight to be given that evidence, not its admissibility.[22]  Here, the only evidence appellant put forth regarding contamination of the evidence is the fact that it was stored by the old HPD crime lab.  Although appellant offered evidence challenging the reliability of the old HPD crime lab as a whole, he offered no evidence that the particular evidence at issue in the instant case had been tampered with or contaminated.  In response to appellant's claims, the State introduced testimony to support the reliability of the evidence at issue.

The trial court made oral findings of fact on the record.[23]  The court found Mehl, Quartaro, and Head to be credible witnesses, qualified to testify in their areas of expertise.  The trial court then recited findings of fact adopting the testimony of the State's witnesses as it is summarized above. The court explicitly found that there was no indication that any of the evidence at issue in appellant's case had been contaminated or mishandled during the time it was stored by the old HPD crime lab.

Ultimately, the court ruled the cigar, sexual assault kit, and panties admissible as reliable and relevant evidence.  The court determined that the results of the DNA tests performed by Orchid Cellmark on the cigar, sexual assault kit, and panties were also admissible as reliable and relevant evidence.  Lastly, the court ruled that the DNA comparison performed by Head at the new HPD crime lab was admissible.

The record supports the trial court's conclusion that the DNA evidence was reliable.  The trial court heard evidence about how and where each piece of evidence at issue was stored. Quartaro and Sergeant Mehl both testified that the evidence appeared to have been stored appropriately,

---

[22]  *Lagrone*, 942 S.W.2d at 617.

[23]  *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (stating that findings of fact rendered after a ruling on a motion to suppress can be in written form or stated orally on the record).

separated and sealed in individual containers. Additionally, the trial court found that the locations where the evidence in this case was stored were not the locations described as being deficient in any of the reports critical of the old HPD crime lab.

The record also supports the trial court's conclusion that the DNA evidence was relevant. Evidence is relevant if it makes any fact of consequence more or less probable than it would be without the evidence.[24] Here, the DNA evidence makes appellant's presence at Diana and Arturo's apartment the night Angelo was kidnapped more probable.

Because we defer to the trial court's factual determinations so long as those determinations are supported by the record, we will not disturb the trial court's findings on appeal. The trial court did not abuse its discretion in admitting the forensic evidence, and appellant's due process rights have not been violated. Appellant's first point of error is overruled.

In his second point of error, appellant contends that the trial court erred when it limited his ability to present a defense by excluding evidence critical of the old HPD crime lab and limiting his cross-examination of witnesses with respect to testimony critical of the old HPD crime lab. We will address each complaint in turn.

Although defense exhibits 2-9 were offered into evidence at the motion-to-suppress hearing, they were not the subject of the defense's motion to suppress. Instead, they were offered in support of the defense's motion to suppress, and the trial court included a ruling on their admissibility at trial in its findings of fact. Because the trial court's ruling on defense exhibits 2-9 was an evidentiary ruling, separate from its ruling on the defense's motion to suppress the State's evidence, we review

---

[24] TEX. R. EVID. 401 (West 2014). We cite to the version of the Rules of Evidence that was in effect at the time of appellant's trial. Although the Rules of Evidence have been amended, effective April 1, 2015, we note no substantive changes to the rules pertinent to this case.

the denial of exhibits 2-9 for an abuse of discretion only.[25]

First, appellant complains of the trial court's exclusion of defense exhibits 2-9 as a violation of his right to compel the attendance of witnesses in his favor and a limitation on his ability to present a defense. Absent an abuse of discretion, a trial court's evidentiary ruling will not be disturbed on appeal.[26] A trial court abuses its discretion only if its ruling lies outside the zone of reasonable disagreement.[27]

Defense exhibits 2-9 were offered at the hearing on the motion to suppress the State's DNA evidence. At that hearing, the trial court ruled that defense exhibits 2-9 were inadmissible at trial. Defense exhibits 2-7 consisted of a report termed the "Bromwich Report." The Bromwich Report was initiated in response to the closure of the old HPD crime lab in 2003 and heavily criticized the lab in the areas of quality assurance, internal auditing, training, and standard operating procedure.

The trial court determined that nothing in the Bromwich Report related to the specific evidence being offered by the State and, as such, was irrelevant under Rule 401 and inadmissible under Rule 402. Alternatively, the court held that, even if some portions were relevant, the probative value substantially outweighed the danger of unfair prejudice, confusion of the issues, and the misleading of the jury under Rule 403.

Defense exhibits 8 and 9 consisted of misconduct reports and criminal histories for three former HPD crime lab employees, J. Chu, B. Sharma, and D. Wallace, who dealt with the forensic

---

[25] *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) ("An appellate court reviewing a trial court's ruling on the admissibility of evidence must utilize an abuse-of-discretion standard of review."); *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999).

[26] *Weatherred*, 15 S.W.3d at 542.

[27] *Id*.

evidence offered by the State when it was first collected and sent to HPD in 1992. None of these employees were called to testify in appellant's trial. Additionally, none of the results of tests performed by any old HPD crime lab employees were offered into evidence. That being true, the trial court determined that evidence concerning any misconduct on the part of Chu, Sharma, or Wallace was irrelevant under Rule 401 and inadmissible under Rules 402, 403, 404, 608, and 609.

Evidence is relevant only if it tends to make a fact of consequence more or less probable than it would be without the evidence.[28] Based on the fact that none of the old HPD crime lab employees were called to testify for the State, coupled with the fact that results from the tests each performed were not offered into evidence, it was not outside the zone of reasonable disagreement to determine that evidence regarding these witnesses was irrelevant. Additionally, because these exhibits did not comprise the entire substance of appellant's defense, we cannot say that their exclusion prevented him from presenting a defense.[29] Finding support in the record for the trial court's ruling, we hold that the trial court did not abuse its discretion in refusing to admit defense exhibits 2-9.

Appellant also complains in his second point of error that the trial court erred when it limited his cross-examination as it related to the State's DNA evidence and the old HPD crime lab. Specifically, appellant complains that his cross-examination of Sergeant Mehl, FBI Agent Griselle Guzman, Matt Quartaro, and Courtney Head was impermissibly limited. Appellant's claim in this Court is grounded in the Confrontation Clause of the Sixth Amendment. As a threshold matter, the State asserts that appellant has not preserved a confrontation objection for review. A party must object in the trial court, and obtain a ruling on his objection, before he can present his complaint for

---

[28] TEX. R. EVID. 401 (West 2014).

[29] *See infra* Part III.A.

appellate review.[30]  Because appellant did not object in the trial court on Confrontation Clause grounds, he has not preserved that claim for review in this Court.

At the hearing on the motion to suppress, the trial court ruled that appellant would not be permitted to go into the Bromwich Report, the closure of the old HPD crime lab, the reasons for that closure, or the misconduct of former HPD crime lab employees who were not going to testify.  The trial court explicitly stated it would allow cross-examination on the issues of where the evidence was stored, whether those locations were proper, to whom the evidence was taken, and whether the storage conditions were proper for reducing or preventing contamination.

At trial, on direct examination, Sergeant Mehl testified that law enforcement officers did not consider the presence of DNA as evidence when they investigated crimes in 1992, the year of the instant offense.  In order to correct the impression that DNA evidence and analysis was not utilized by law enforcement in 1992, the trial court permitted appellant to cross-examine Sergeant Mehl on the fact that the existence of DNA testing was known by police agencies in 1992 and that some of the evidence relevant to the case at bar had been submitted to the old HPD crime lab for DNA analysis.

Prior to beginning his cross-examination, defense counsel attempted to re-urge his objection to the trial court's ruling at the hearing on his motion to suppress limiting his cross-examination on the topics of the Bromwich Report and the old HPD crime lab's closure.  Specifically, defense counsel stated:

[Defense counsel]: Yes, Your Honor. You know I want to go into all that other stuff?

[The court]: I understand that.

---

[30] TEX. R. APP. P. 33.1.

[Defense counsel]: Just so my record is clear, I'm not withdrawing my attempt to go into it. I'm just–

[The court]: I'm not allowing you to go into the other stuff. Genetic Design, any of the HPD crime lab studies or anything that's contained in that study or anything about its closure. Okay?

[Defense counsel]: Yes ma'am.

Appellant's objection does not in fact make his record clear. "[T]o preserve an issue for appeal, a timely objection must be made that states the specific ground for the objection, if the specific ground is not apparent from the context."[31] An objection must be sufficiently specific to tell the trial court what a party wants and why he feels himself entitled to it. The trial colloquy excerpted above does not specifically indicate the legal basis for appellant's objection to the trial court's limitation on his cross-examination. Indeed, appellant specifies no grounds for his objection.

Even without a specific objection, error may be preserved if the grounds for the objection are apparent from its context, such that context can save an otherwise ambiguous objection.[32] But even when the above exchange is read in the context of the motion to suppress, we cannot discern a Confrontation Clause objection. In his written motion to suppress, appellant contests the admission of the State's forensic evidence and related testimony on Fourth Amendment grounds. Then, at the hearing on the motion to suppress, where the trial court first ruled on the extent of appellant's cross-examination, the focus was on the relevance of the testimony sought to be elicited, not on the Confrontation Clause. Because appellant did not specifically state he was objecting on

---

[31] *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006).

[32] *Id*. *See Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (holding that the circumstances surrounding the defendant's objection and the trial court's ruling made it clear that the trial court was aware of the basis of the defendant's objection).

Confrontation Clause grounds at the hearing on the motion to suppress or at trial, an objection on that basis with regard to Sergeant Mehl's cross-examination is not preserved for our review.[33]

Second, appellant complains that his cross-examination of FBI Agent Griselle Guzman was erroneously limited. During the State's direct examination of Agent Guzman, the State introduced two buccal swabs taken from appellant. In response to the State's offer, appellant informed the court that the swabs were covered by his motion to suppress and indicated that he had no "further objections." When given the opportunity to cross-examine Agent Guzman, appellant declined, and Guzman was released. Appellant lodged no Confrontation Clause objection to the trial court's limitation on his cross-examination at trial or during the hearing on his motion to suppress, so his Confrontation Clause claim as it relates to the cross-examination of Agent Guzman is not preserved for our review.

Third, appellant complains that his cross-examination of Matt Quartaro was limited. During the State's direct examination of Quartaro, it offered the cigar, sexual assault kit, and panties into evidence. Appellant objected to the admission of this evidence on chain of custody grounds. The trial court overruled appellant's objection and at the same time reiterated its limitation on appellant's cross-examination to questions about apparent contamination or degradation. At no point did appellant object on the basis of the Confrontation Clause. Appellant made no Confrontation Clause objection during the hearing on his motion to suppress either. Again, because appellant did not specifically state an objection based on the Confrontation Clause, this claim is not preserved for our review.

---

[33] *Cf. Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000) (holding that a hearsay objection does not preserve a Confrontation Clause objection for appellate review).

Lastly, appellant complains of the limitations placed on his cross-examination of Courtney Head. During Head's direct examination the State offered several items into evidence. Each time appellant said, "No additional objections," and the State's evidence was admitted. During his cross-examination, defense counsel approached the trial court and asked to expand the scope of his cross-examination to include quality-control issues at the old HPD crime lab. The following colloquy ensued:

> [Defense counsel]: I'm thinking, if you'll allow me to go into the quality control that existed on other things when they were ran by the crime lab because of what–she didn't work there, number one. And, number two, the old crime lab–I want to do that, but I don't want to do it if you've told me not to.
>
> [The court]: Do not go into that.
>
> [Defense counsel]: Okay.

Nothing further was said on the subject, and Head was released. Appellant lodged no Confrontation Clause objection to the trial court's limitation of his cross-examination of Head at trial or at the hearing on his motion to suppress. Accordingly, his Confrontation Clause claim has not been preserved for our review.

An appellant forfeits his confrontation complaint if he fails to object at trial.[34] In this case, appellant never objected on the basis of the Confrontation Clause at trial or during his pretrial motion-to-suppress hearing. We have previously emphasized the importance of specifying

---

[34] *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) ("We hold that in failing to object at trial, appellant waived any claim that admission of the videotape violated his rights to confrontation and due process/due course of law."); *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("[A]lmost all error–even constitutional error–may be forfeited if the appellant failed to object. We have consistently held that the failure to object in a timely manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant.").

constitutional bases for objections because of the stricter harm analysis performed on appeal.[35] Because appellant failed to lodge a Confrontation Clause objection in the trial court, this claim has not been preserved and we do not reach the merits of appellant's Confrontation Clause complaint as it relates to the limitations placed on his cross-examination. Appellant's second point of error is overruled.

*C. Extraneous Offense Evidence*

In his fourth and fifth points of error, appellant complains that the trial court erred when it admitted evidence of an extraneous offense. Appellant's objection is two-fold: the actual extraneous offense appellant complains of is a drug charge, unrelated to the capital murder, but his objection encompasses the admission of the fact of the drug charge along with the admission of the fact of his subsequent bond forfeiture on that charge when he failed to appear at a scheduled court date.

We note at the outset that the trial court did not admit any evidence as to the character of the underlying offense for which appellant was on bond. Instead, the trial court limited the evidence to the mere fact that appellant forfeited a bond by failing to appear on an unrelated criminal offense. Therefore, our analysis will address only the admission of evidence of appellant's bond forfeiture and flight as shown by appellant's failure to appear in an unrelated, unnamed criminal case.

In his fourth point of error, appellant contends this evidence was inadmissible under Rule 404(b). In his fifth point of error, appellant contends the evidence was inadmissible under Rule 403. Because our analysis is the same for both complaints, we will address them together.[36] We review

---

[35] *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012).

[36] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

a trial court's evidentiary ruling for an abuse of discretion.[37] We will affirm an evidentiary ruling unless it lies outside the zone of reasonable disagreement.[38]

During trial, the State sought to introduce evidence that appellant failed to appear at a scheduled court date on an unrelated drug charge approximately one week after the instant offense occurred. Through FBI Agent Eric Johnson, the State attempted to introduce testimony that, at the time of Angelo's kidnapping, appellant had a pending felony drug case in Harris County for which he had posted a bond, that appellant forfeited that bond when he failed to appear for a scheduled court date, and that, subsequent to his failure to appear, a federal warrant for unlawful flight to avoid prosecution was issued.

Appellant objected to the admission of Agent Johnson's testimony on Rule 404(b), Rule 403, and hearsay grounds. Ultimately, the trial court allowed Agent Johnson to testify to the fact that appellant had a pending criminal case in Harris County at the time of the commission of the instant offense and that, approximately one week after the instant offense took place, appellant failed to show up at a scheduled appearance for his pending case. Agent Johnson also testified that, at the time of his flight, appellant was a suspect in Angelo's kidnapping. The trial court specifically excluded evidence about the federal flight warrant and about the type of case for which appellant failed to appear.

Additionally, the court admitted a docket sheet that indicated appellant had been present at all of his previous court appearances in his pending drug case–approximately twelve settings over

---

[37] *Id; Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005).

[38] *Montgomery*, 810 S.W.2d at 391; *Cantrell v. State*, 731 S.W.2d 84, 90 (Tex. Crim. App. 1987) ("[T]he trial judge's discretion in admitting an extraneous offense is to be given due deference.").

fifteen months. The trial court found consciousness of guilt as indicated by flight to be a permissible use for the extraneous offense evidence under Rule 404(b) and found that the probative value of the evidence was not outweighed by its prejudicial effect.

"Extraneous-offense evidence is admissible under both Rules 403 and 404(b) if that evidence satisfies a two-pronged test: (1) whether the extraneous-offense evidence is relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character; and (2) whether the probative value of the evidence is not substantially outweighed by unfair prejudice."[39] The first prong of this test requires us to determine (a) whether the evidence is relevant at all and (b) whether the evidence is relevant to something other than a showing of character conformity.

Rule 401 governs relevance and provides, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[40] Generally, evidence of flight is a relevant circumstance from which a jury can infer guilt.[41] This is true specifically in the context of bail-jumping.[42] Indeed, flight is admissible "even though it may show the commission

---

[39] *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006); *Johnston v. State*, 145 S.W.3d 215, 220 (Tex. Crim. App. 2004).

[40] TEX. R. EVID. 401 (West 2014).

[41] *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) ("Evidence of flight or escape is admissible as a circumstance from which an inference of guilt may be drawn."); *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994) (same); *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989) (same).

[42] *Cantrell*, 731 S.W.2d at 93 ("The forfeiture of an accused's bail bond may be proved as tending to show flight....And flight, in the context of bail-jumping, may be construed as evidence of guilt."). *See Wockenfuss v. State*, 521 S.W.2d 630, 632 (Tex. Crim. App. 1975) (holding that evidence of defendant's bond forfeiture was admissible absent the defendant showing the bond

(continued...)

of other crimes."[43]   But before evidence of flight can be admitted, it must appear the flight has some legal relevance to the case being prosecuted.[44]

Here, the timing of appellant's flight from prosecution on his drug case is a relevant circumstance of guilt in the instant case. Appellant fled the jurisdiction only one week after Angelo was kidnapped and killed. The docket sheet for appellant's drug offense indicated appellant had never missed a court date until the court date immediately following the date of the instant offense and that appellant forfeited his bond when he fled. The trial court did not abuse its discretion in finding that appellant's flight one week after Angelo was kidnapped and killed was relevant.

After relevance has been established, the burden shifts to appellant to make an affirmative showing that the flight is not connected with the offense on trial and is instead connected to some other transaction.[45]

Appellant argues that any evidence of flight from the drug prosecution was unrelated to the capital murder prosecution and showed only consciousness of guilt as to the drug charge. Further, appellant argues that, because he was not yet charged in the instant case at the time he forfeited his bond on the drug case, such forfeiture cannot be construed as an act designed to avoid prosecution

---

(...continued)
forfeiture was related to another offense).

[43]   *Cantrell*, 731 S.W.2d at 92; *McWherter v. State*, 607 S.W.2d 531, 534-35 (Tex. Crim. App. 1980) ("The fact that circumstances of flight incidentally show the commission of another crime does not render the evidence inadmissible.").

[44]   *Hodge v. State*, 506 S.W.2d 870, 873 (Tex. Crim. App. 1974) (op. on reh'g). *See Wockenfuss*, 521 S.W.2d at 632.

[45]   *Burks*, 876 S.W.2d at 904; *Hodge*, 506 S.W.2d at 873. *See Wockenfuss*, 521 S.W.2d at 632.

in the instant case. We disagree.

While appellant's failure to appear for his drug case could have been motivated by his desire to avoid prosecution in that case alone, there is evidence to support the trial court's conclusion that appellant's failure to appear related to the instant capital murder prosecution. The timing of appellant's absence, combined with his status as a suspect in Angelo's kidnapping and the fact that he had been present at all prior court dates, supports the finding that appellant's failure was, at least in part, motivated by a desire to avoid arrest and prosecution for Angelo's murder.[46]

Evidence of appellant's absence from court one week after the commission of the capital murder meets the low threshold for relevance imposed by Rule 401, but this is not the end of our inquiry, because Rule 401 is limited by Rule 404(b). Rule 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.[47]

Therefore, Rule 404(b) tempers what would otherwise be admissible under Rule 401 by distinguishing between acceptable and unacceptable uses of relevant extraneous-offense evidence. Rule 404(b) prohibits the use of extraneous-offense evidence to show character conformity. And while the latter half of Rule 404(b) provides a list of potential permissible uses of extraneous-offense evidence, it does not contain an exhaustive list of the "other purposes" for which extraneous-offense

---

[46] In *Burks*, we stated, "Since appellant was already identified as a suspect in the case, his flight when confronted by the police was relevant to the issue of whether or not he committed the instant crime." *Burks*, 876 S.W.2d at 903-04.

[47] TEX. R. EVID. 404(b) (West 2014).

evidence can be used.[48]

It follows, then, that once extraneous-offense evidence meets Rule 401's test, it will be admitted if it serves any relevant purpose–whether listed in 404(b) or not–other than showing character conformity.

"[C]riminal acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as showing 'consciousness of guilt.'"[49] Here, appellant failed to appear in court on an unrelated drug charge. Failure to appear at a scheduled court date is a criminal act.[50] Based on the timing of appellant's bond forfeiture, there is evidence to support the trial court's conclusion that such forfeiture was motivated by a desire to reduce the likelihood of arrest and prosecution for Angelo's murder, making evidence of the forfeiture admissible under Rule 404(b).

Furthermore, evidence of appellant's flight was not used to show conformity with a general criminal disposition. Instead, the evidence of appellant's failure to appear was used to show a disruption in appellant's normal course of attending his scheduled court dates after the commission of the offense in this case. The trial court did not abuse its discretion in finding that evidence of appellant's bond forfeiture was admissible under Rule 404(b).

Next, we determine whether the extraneous-offense evidence was barred by Rule 403. Rule

---

[48] *Banda v. State*, 768 S.W.2d 294, 296 (Tex. Crim. App. 1989) ("Whether or not it neatly fits one of [the 404(b)] categories, an extraneous transaction will be admissible so long as it logically tends to make the existence of some fact of consequence more or less probable."); *Johnston*, 145 S.W.3d at 220 ("This list is illustrative, not exhaustive.").

[49] *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996) (op. on reh'g).

[50] TEX. PENAL CODE § 38.10(a).

403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[51]

Rule 403's prohibition against the admission of evidence whose probative value is substantially outweighed by the danger of unfair prejudice is not intended to keep out all evidence that tends to prejudice the opponent's case.[52] Instead, it aims to prevent only the admission of evidence that promotes a jury decision on an improper basis.[53]

Here, the court determined that the probative value of the extraneous-offense evidence was that it made a showing of flight and potentially provided evidence of guilt. Additionally, the court took steps to ameliorate the prejudicial effect of the extraneous-offense evidence by redacting the name of the offense. We cannot say that the prejudicial effect of the extraneous-offense evidence substantially outweighed its probative value. The trial court did not err in finding that this evidence was admissible under Rule 403.

The trial court's decision to admit Agent Johnson's testimony concerning appellant's bond forfeiture does not lie outside the zone of reasonable disagreement as to its admissibility, so the trial court did not abuse its discretion in admitting the evidence under Rule 404(b) or Rule 403. Appellant's fourth and fifth points of error are overruled.

---

[51] TEX. R. EVID. 403 (West 2014).

[52] *See Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) ("All testimony and physical evidence are likely to be prejudicial to one party or the other. It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable.") (internal citations omitted).

[53] *Montgomery*, 810 S.W.2d at 389. *See Davis*, 329 S.W.3d at 806.

*D. Improper Jury Argument*

In points of error eight and nine appellant contends that the State engaged in improper jury argument during the guilt phase of trial. In his eighth point of error, appellant complains of the following statements made by the prosecutor as being outside the record:

> [The State]: Let me give you another example, another example of half the story. The SANE nurse. She came here and she said: Well there were no injuries. Wow, that must mean Obel Cruz-Garcia is guilty–is not guilty of capital murder according to the defense attorneys. No. Let's talk about what else the SANE nurse said. And I want to say she said 95%–it is a very high percentage–of rape cases that she does SANE nurse examinations on–
>
> [Defense counsel]: Objection. Outside the record.
>
> [The State]: –do not have any injuries.

The trial court overruled appellant's objection and stated, "But I will remind the jury that you recall the testimony from the witness stand and that is–that will be your guide in your deliberations. Arguments of counsel is not evidence."

The State concedes that the prosecutor mischaracterized the SANE nurse's testimony. At trial Gloria Kologinczok, the SANE nurse who examined Diana, testified that she does not see physical injuries resulting from sexual assaults in most of the sexual assault exams she performs. Kologinczok did not further quantify how often she sees physical injuries during sexual assault exams, as the prosecutor did during her closing argument.

Jury argument generally serves at least four permissible purposes: summation of the evidence, reasonable deductions from the evidence, answers to arguments of opposing counsel, and pleas for law enforcement.[54] It is error to insert facts into closing argument that are not supported

---

[54] *Davis*, 329 S.W.3d at 821.

by the record.[55]    Because her statement was not supported by the record, the prosecutor's quantification of Kologinczok's testimony was improper, and the trial court erred when it overruled appellant's objection.

"However, every inappropriate remark made during closing arguments does not require the reversal of a conviction."[56]  A reversal will be required only if the improper argument is harmful.[57]  To determine whether the argument was harmful, we must engage in a harm analysis.[58]  The Rules of Appellate Procedure provide two avenues for harm analysis, depending upon the type of error committed: constitutional or nonconstitutional.[59]

We have held that jury argument that injects facts outside the record is nonconstitutional error.[60]  As such, it is governed by Texas Rule of Appellate Procedure 44.2(b).[61]  Rule 44.2(b) provides, "Any other error, defect, irregularity, or variance that does not affect substantial rights must

---

[55] *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999) ("Error exists when facts not supported by the record are injected in the argument...."); *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011).

[56] *Lagrone*, 942 S.W.2d at 619 (citing *Hernandez v. State*, 819 S.W.2d 806, 820 (Tex. Crim. App. 1991)).

[57] *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

[58] *Id.*

[59] *Compare* TEX. R. APP. P. 44.2(a) and TEX. R. APP. P. 44.2(b).

[60] *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000) ("Comments upon matters outside the record, while outside the permissible areas of jury argument, do not appear to raise any unique concerns that would require us to assign constitutional status. We shall therefore apply the standard of harm for nonconstitutional error."). *See Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008) (stating improper-argument error that arose when prosecutor "delved into matters that were well outside the record" was nonconstitutional in nature).

[61] *Martinez*, 17 S.W.3d at 692.

be disregarded."[62]  Therefore, unless the State's improper jury argument error affected appellant's substantial rights, it will not call for a reversal of appellant's conviction.[63]

To determine whether the error affected a substantial right, and was therefore harmful, this Court looks at three factors: (1) the severity of the misconduct, (2) any curative measures employed to correct the misconduct, and (3) the certainty of conviction without the misconduct.[64]

First, we examine the severity of the misconduct. The error arose during the State's final closing argument in the guilt phase of trial.  After objection, the prosecutor immediately moved on from the topic of the SANE nurse.  The error did not relate directly to the act of kidnapping or killing Angelo, but instead related only to the sexual assault alleged to have taken place prior to the kidnapping.  The SANE nurse did indeed testify that, in most of the sexual assault exams that she performs, she does not see injuries, so the prosecutor erred only in assigning a numerical value to the nurse's testimony.

Additionally, viewing the misconduct in light of the entire record of jury arguments, the statement was not extreme or manifestly improper.  The statement was made in the middle of a closing argument that spans twenty-one pages of the record, and the prosecutor never emphasized the statement or returned to the topic of the sexual assault after appellant's objection.  We find the severity of the misconduct to be slight.

With respect to curative measures, the trial court immediately reminded the jury that statements made in closing arguments are not evidence, decreasing the likelihood that jurors would

---

[62] TEX. R. APP. P. 44.2(b).

[63] *Id.*; *Martinez*, 17 S.W.3d at 692.

[64] *Mosley*, 983 S.W.2d at 259; *Martinez*, 17 S.W.3d at 692-93.

attach significance to the improper statement. Although this does not amount to a curative instruction, it weighs in favor of the error being harmless.[65]

Lastly, appellant's conviction was relatively certain, even without the misconduct. As discussed extensively above, there was direct and circumstantial evidence connecting appellant to Angelo's kidnapping and murder. Based upon the evidence before the jury, it is highly unlikely that the prosecutor's misstatement impacted appellant's conviction. Appellant's eighth point of error is overruled.

In his ninth point of error, appellant complains that the prosecutor injected her personal beliefs into her closing argument. Appellant contends that the following argument was improper:

[The State]: We ask you to find him guilty as a party because what we believed happened is the defendant directed and encouraged–

[Defense counsel]: Objection to putting beliefs into argument, Your Honor. It's improper.

[The court]: That will be overruled.

It is improper for a prosecutor to inject her opinion into statements made before the jury.[66] However, it is proper for a prosecutor to argue her opinion where that opinion is based upon evidence in the record.[67]

As stated above, permissible jury argument generally falls into one of four categories: summation of the evidence, reasonable deductions from the evidence, answers to arguments of

---

[65] *Freeman*, 340 S.W.3d at 728-29.

[66] *Johnson v. State*, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985).

[67] *Wolfe v. State*, 917 S.W.2d 270, 281 (Tex. Crim. App. 1996) (quoting *McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985)).

opposing counsel, and pleas for law enforcement.[68]

We conclude that the prosecutor's discussion of what the State believed happened was a summation of the evidence presented at trial. Rudy testified that appellant kidnapped Angelo, drove him to Baytown, and then ordered Roger to kill to him. After Angelo's death, appellant ordered Rudy and Roger to submerge Angelo's body. Even if the prosecutor's statement injected her opinion into her argument, her opinion was sufficiently supported by the evidence presented at trial.

Even assuming *arguendo* that the prosecutor's argument was improper, it was harmless. Jury argument error is analyzed for harm under Texas Rule of Appellate Procedure 44.2(b).[69] Under the 44.2(b) standard, error will not require reversal unless it affects a substantial right.[70] To determine whether error affects a substantial right in the improper-jury-argument realm, we weigh the three factors discussed above: the severity of the misconduct, any curative measures taken, and the likelihood of conviction absent the misconduct.[71]

Here, any possible misconduct was not severe. After reading the prosecutor's statement in the context of the entire record of jury arguments, we conclude the prosecutor was merely summarizing the State's theory of the case and not suggesting to the jury that she had outside knowledge about contested facts.

Further, while the trial court did not take any steps to cure the error, the prosecutor immediately rephrased her statement and said, "What the evidence supports is that the defendant

---

[68] *Davis*, 329 S.W.3d at 821.

[69] *Martinez*, 17 S.W.3d at 692.

[70] TEX. R. APP. P. 44.2(b).

[71] *Mosley*, 983 S.W.2d at 259.

directed and encouraged Roger to kill the little boy." This quasi-curative measure works in favor of the error being harmless.[72]

Additionally, appellant's conviction was relatively certain, even absent the prosecutor's statement. Appellant's ninth point of error is overruled.

### III. Punishment

*A. Mitigating Evidence in Punishment*

In his sixth and seventh points of error, appellant complains that the trial court erred when it sustained the State's hearsay objections to two items of evidence he offered during the punishment phase of trial. The first piece of evidence, complained of in point of error six, was a series of Bible study certificates that appellant earned while incarcerated in Puerto Rico. The second piece of evidence, complained of in point of error seven, was testimony that appellant worked as an informant for several American federal agencies. Appellant now complains that the trial court's exclusion of these pieces of evidence violated his right to put forth a complete defense. Assuming without deciding that appellant preserved this complaint, we overrule appellant's sixth and seventh points of error.

We review a trial court's evidentiary ruling for an abuse of discretion.[73] So, if the trial court's determination falls within the zone of reasonable disagreement, we will not disturb it on

---

[72] *Hawkins v. State*, 135 S.W.3d 72, 85 (Tex. Crim. App. 2004) ("Although a prosecutor's self-corrective action might not carry the same weight as a trial court's instruction to disregard, it is nevertheless a relevant consideration in determining harm and can, in the appropriate circumstances, render an improper comment harmless."). *See Canales v. State*, 98 S.W.3d 690, 695-96 (Tex. Crim. App. 2003) (holding that a prosecutor's misstatement of the law was harmless when, immediately following the misstatement, the prosecutor corrected his mistake).

[73] *Weatherred*, 15 S.W.3d at 542.

appeal.[74] We begin with appellant's sixth point of error. Appellant attempted to offer his own Bible study certificates through his brother, Joel Cruz-Garcia. The State objected that the certificates were hearsay, and the trial court sustained the objection. Appellant now complains that the trial court's ruling excluding the certificates from evidence violated his right to put forth a complete defense.

A criminal defendant's right to present relevant evidence is not absolute.[75] Instead, it is subject to reasonable restrictions that accommodate other legitimate interests in the criminal trial process.[76] Where mitigating evidence comes in an objectionable form, neither the Texas nor the United States Constitutions require its admission.[77] The Constitution is implicated only if the evidentiary rule being employed to exclude evidence is applied arbitrarily or unjustly and its application effectively precludes a defendant from putting forth a defense.[78]

Here, appellant's proffered evidence was limited by the application of the hearsay rule. The rule against hearsay prohibits the admission of out-of-court statements offered to prove their truth.[79]

---

[74] *Id.*

[75] *United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."); *Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991) ("Although the Eighth Amendment to the United States Constitution assures that no person shall be put to death without the opportunity to bring before the sentencing authority all evidence of mitigating circumstances, the Constitution does not assure that the evidence be received in a form which is otherwise objectionable.").

[76] *Scheffer*, 523 U.S. at 308.

[77] *Id.*; *See Renteria v. State*, 206 S.W.3d 689, 697 (Tex. Crim. App. 2006) (concluding that admission of constitutionally relevant evidence is not required if it is otherwise objectionable under state law).

[78] *Potier v. State*, 68 S.W.3d 657, 662 (Tex. Crim. App. 2002).

[79] TEX. R. EVID. 801(d) (West 2014).

Appellant's certificates were indeed hearsay because they each contained out-of-court statements that appellant was offering for their truth. As hearsay, the evidence was inadmissible unless it fit within an exception or exclusion.[80] Appellant, as the proponent of the evidence, bore the burden of articulating an exception or exclusion under which the Bible study certificates would be properly admissible.[81] Appellant offered no such exceptions.

Appellant now asserts that the Bible study certificates were admissible under Texas Rules of Evidence 803(11), 803(13), 803(19), and 804(3). Without deciding whether appellant has forfeited his error by failing to allege his hearsay exceptions in the trial court, we hold that none have merit.

First, appellant's certificates do not qualify as Records of a Religious Organization under Rule 803(11) because they are not statements of birth, marriage, divorce, death, legitimacy, ancestry, relationship, or other fact of personal history. Second, appellant's certificates do not qualify as Family Records under Rule 803(13) because they are not statements of fact concerning personal or family history, nor are they contained in any of the documents listed in Rule 803(13). Third, appellant's certificates do not meet the requirements in Rule 803(19) because they do not concern a person's birth, adoption, marriage, divorce, death, legitimacy, relationship, ancestry, or other fact of personal or family history. Lastly, appellant's certificates do not qualify under Rule 804(b)(3) because appellant has failed to establish the unavailability of the certificates' declarant. Further, the certificates do not contain any statements about the declarant's own birth, adoption, marriage,

---

[80] *Valle v. State*, 109 S.W.3d 500, 505 (Tex. Crim. App. 2003).

[81] *Martinez v. State*, 178 S.W.3d 806, 815 (Tex. Crim. App. 2005) ("The State, as the proponent of the evidence, had the burden of demonstrating the applicability of that exemption or exception.").

ancestry, or fact of personal or family history, nor do they contain statements about any of the foregoing with respect to a person related to or intimately associated with the declarant. Additionally, appellant's Bible study certificates do not bear "persuasive assurances of trustworthiness," which weighs in favor of the trial court's exclusion.[82]

The rule excluding hearsay that does not fit within an exception or exclusion is not an arbitrary rule, nor was it arbitrarily or unjustly applied to appellant.[83] Instead, the rule represents a reasonable restriction on the admission of evidence that accommodates other legitimate criminal-trial interests, namely, ensuring the reliability of evidence.[84]

While appellant contends that the hearsay rule should give way in favor of his right to put on a defense, "[t]he fact that appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his

---

[82] *See Valle*, 109 S.W.3d at 506 (affirming the exclusion of hearsay evidence because it did not meet an exception to the hearsay rule and did not bear persuasive assurances of trustworthiness).

[83] *Potier*, 68 S.W.3d at 662 ("These cases show that the exclusion of relevant, material, important evidence by the application of particular rules that are arbitrary or disproportionate to their purposes may offend the Constitution. They also show that courts are free to apply evidentiary rules that are not arbitrary and unjustified.").

[84] *Id*. at 666 (holding that the hearsay rule, when properly applied, is a valid limitation on a defendant's evidence). *See Renteria*, 206 S.W.3d at 697. ("[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary only where it has infringed upon a weighty interest of the accused."). *See Valle*, 109 S.W.3d at 506 (holding that defendant's hearsay evidence that was not within an exception and that did not bear "persuasive assurances of trustworthiness" was properly excluded).

defense to the jury."[85] Because appellant was not prevented from presenting the substance of his defense, the trial court did not abuse its discretion when it sustained the State's hearsay objection and excluded appellant's Bible study certificates. Appellant's sixth point of error is overruled.

Turning now to appellant's seventh point of error, appellant once again contends that the trial court violated his right to put forth a meaningful defense when it sustained the State's hearsay objection to testimony about whether appellant worked as an informant for various federal law enforcement agencies in the United States. But again, appellant's right to the admission of evidence in his defense is not absolute.[86] If defense evidence is presented in a form that violates the rules of evidence, and those rules are not being arbitrarily applied, it is not properly admissible.[87]

The testimony appellant attempted to elicit through Puerto Rican police officer, Agent Juan DeJesus Rodriguez, about appellant's work as a federal informant was hearsay because Agent Rodriguez had no personal knowledge of appellant's work and had learned about this alleged work only through conversations with other agents. Because the testimony about what other agents told Agent Rodriguez was an out-of-court statement being offered for its truth, the State's hearsay objection was proper.[88]

In response to the State's objection, appellant offered no applicable exceptions or exclusions

---

[85] *Valle*, 109 S.W.3d at 507; *See Potier*, 68 S.W.3d at 665 ("We hold that the exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.").

[86] *Scheffer*, 523 U.S. at 308; *Lewis*, 815 S.W.2d at 568.

[87] *See Potier*, 68 S.W.3d at 666 (holding that the hearsay rule is a valid limitation on a defendant's evidence when it is correctly applied).

[88] TEX. R. EVID. 801 (West 2014).

to the hearsay rule. Appellant now asserts that Agent Rodriguez's testimony was admissible under Texas Rule of Evidence 803(21). Again, without deciding whether appellant has forfeited this claim, we hold that it lacks merit. Agent Rodriguez's testimony did not concern appellant's *character* among appellant's associates or within his community, so it does not meet the requirements of Rule 803(21).

The exclusion of Agent Rodriguez's testimony as hearsay did not effectively preclude appellant from putting on a defense, and the application of the hearsay rule was not arbitrary or unjust. Consequently, the trial court did not abuse its discretion when it sustained the State's objection and excluded appellant's evidence. Appellant's seventh point of error is overruled.

*B. Improper Jury Argument*

In his tenth and eleventh points of error, appellant complains of improper jury argument during the punishment phase of trial. In point of error ten, appellant complains that the trial court erred when it overruled his objection to part of the State's argument, which he contends went outside the record. During her punishment summation, the prosecutor stated:

> Who is orchestrating this deal? Who is orchestrating all the criminal conduct that he's involved in from all the evidence that you've heard? Him. He is the boss. And that's why when he told Roger to stab that little boy, he did. And Roger will pay the price for that when his turn comes, but don't take the blame off of the man who told him to do it. Don't excuse him. Because I will tell you right now, if it were up to Roger alone, Angelo would still be alive.

Appellant objected that the last sentence was outside the record. The trial court overruled the objection and instructed the jury that the arguments of counsel are not evidence. Appellant now complains of this ruling on appeal. In response, the State contends appellant forfeited his error with respect to this argument, or alternatively, that the statement was a proper deduction from the

evidence.

Assuming without deciding that error was preserved, we agree with the State's contention that the statement was a proper deduction from the evidence. Throughout trial, the jury heard ample evidence of appellant's role as the ringleader of the violence that unfolded on the night Angelo died. Rudy testified that appellant was in charge and ordered Angelo's death because Angelo saw appellant sexually assaulting Diana. The prosecutor's statement that, if it were up to Roger, Angelo would still be alive, was merely a restatement of what was already before the jury as the State's theory of its case and was a proper deduction from the evidence presented at trial. Appellant's tenth point of error is overruled.

In his eleventh point of error, appellant complains that the trial court erred when it denied his motion for a mistrial after improper jury argument from the State during closing arguments in the punishment phase of trial. Appellant complains that the State went outside the record when it argued, "What else? They want to minimize the escape attempt. Justin talked to you about that. What do you think happened after he attempted to escape? You think he might have wound up in administrative segregation? I bet he did."

Appellant objected, and the trial court sustained his objection. The trial court instructed the jury to "disregard the last comment by [the prosecutor] and not consider it for any reason." Appellant then moved for a mistrial, which was denied. Appellant now complains of this denial. We review a trial court's refusal to grant a mistrial for an abuse of discretion.[89] Unless the trial

---

[89] *Hawkins*, 135 S.W.3d at 77.

court's ruling was outside the zone of reasonable disagreement, it will not be disturbed on appeal.[90]

A mistrial will be required only in extreme circumstances where the improper conduct is so harmful that continuing with the trial would be wasteful and futile.[91] We apply the same three-factor test articulated in *Mosley*[92] and extended in *Martinez*[93] to evaluate "whether the trial court abused its discretion in denying a mistrial for improper argument."[94]

The first factor examines the severity of the misconduct. When determining the severity of the misconduct, we look at the magnitude of the prejudicial effect and whether the misconduct was extreme or manifestly improper.[95] The misconduct here was slight, and its prejudicial effect was minimal. The State's reference to administrative segregation was brief and was perhaps the most benign evidence offered against appellant during the punishment phase.

Second, we examine curative measures taken by the trial court. Here, the trial court sustained appellant's objection and instructed the jury to disregard the prosecutor's statement. Ordinarily, an instruction to disregard will sufficiently relieve harm, except with respect to the most inflammatory

---

[90] *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

[91] *Hawkins*, 135 S.W.3d at 77.

[92] *Mosley*, 983 S.W.2d at 259 (establishing the three-factor test for determining when improper jury argument during the guilt phase is harmful).

[93] *Martinez*, 17 S.W.3d at 693 (extending the *Mosley* three-factor test to apply to improper jury argument during the punishment phase of trial).

[94] *Hawkins*, 135 S.W.3d at 77.

[95] *Mosley*, 983 S.W.2d at 259; *Brown*, 270 S.W.3d at 573.

statements.[96] The statement at issue was not so inflammatory,[97] and the trial court's actions "sufficiently ameliorated any potential harm."[98]

Lastly, we examine the certainty of the punishment assessed, absent the improper argument. During the punishment phase of trial, the jury heard evidence that appellant murdered another individual for flirting with appellant's girlfriend, and that appellant kidnapped, tortured, and held for ransom two teenagers in Puerto Rico. Given the severity of the punishment evidence, we cannot say that, absent the State's reference to administrative segregation, appellant would have received a different sentence. The trial court did not abuse its discretion when it denied appellant's motion for a mistrial. Appellant's eleventh point of error is overruled.

*C. Motion for New Trial*

In his twelfth and final point of error, appellant asserts that the trial court erred when it denied his motion for a new trial based on alleged jury misconduct during the punishment phase. Appellant also contends that the trial court erred when it refused his request for an evidentiary hearing on his motion. Although the trial court heard argument on appellant's motion for new trial, testimony at the hearing was restricted to affidavits. We review a trial court's decision to hold a live hearing on a motion for new trial, as well as the ruling on such motion, for an abuse of discretion.[99] A trial court

---

[96] *Long v. State*, 823 S.W.2d 259, 269 (Tex. Crim. App. 1991).

[97] *See Martinez*, 17 S.W.3d at 691 (holding that the prosecutor's statement about facts outside the record was not so extreme that it could not be cured by an instruction to disregard).

[98] *Archie*, 221 S.W.3d at 700 (holding that sustaining an objection to the prosecutor's comment on the defendant's failure to testify combined with an instruction to disregard was sufficiently ameliorative of any potential harm such that the error did not require reversal).

[99] *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *State v. Zalman*, 400
(continued...)

abuses its discretion in denying a motion for new trial only if no reasonable view of the record could support the trial court's ruling.[100]

The jury began its punishment deliberations on the afternoon of Thursday, July 18, 2013. The following morning, Friday, July 19, the jurors resumed their punishment deliberations. At some point during their discussion, juror Casey Guillotte asked her fellow jurors how they were going to emotionally cope with their verdict. Ms. Guillotte testified by way of affidavit that her inquiry came after the jury had already agreed on each of the special issues. The other affidavits received by the trial court are ambiguous as to when her question was posed.

In response to this inquiry, several jurors offered words of encouragement. Then, jury foreman Matthew Clinger pulled his Bible from his overnight bag and directed Ms. Guillotte to several passages. Mr. Clinger told Ms. Guillotte that he felt comforted by passages in the book of Romans. Both Mr. Clinger and Ms. Guillotte testified through their affidavits that Mr. Clinger never read aloud from his Bible. Juror Angela Bowman's affidavit indicates that Mr. Clinger "read scriptures from the Bible," but she does not indicate those scriptures were read aloud to the entire jury.

At approximately 3:20 p.m., Ms. Bowman sent a note to the judge asking to speak with her privately. After discussing the request with the attorneys for the State and defense, the judge spoke with Ms. Bowman on the record in her chambers. During this conversation, Ms. Bowman expressed her desire to be replaced with an alternate juror because she could not come to an agreement with

---

(...continued)
S.W.3d 590, 593 (Tex. Crim. App. 2013).

[100] *Holden*, 201 S.W.3d at 763.

the remaining eleven jurors. Ms. Bowman also expressed hesitancy at the idea of having to be sequestered over the weekend. The trial judge told Ms. Bowman that she was unable to replace her with an alternate simply because she was disagreeing with the other jurors and urged Ms. Bowman to continue deliberating.

Approximately one hour later, the jury returned its punishment verdict in such a way that the trial court would sentence appellant to death. The trial court polled the jury, and each juror confirmed that the verdict rendered was his or her true and correct verdict.

Later that evening, Mario Madrid, one of appellant's trial attorneys, received a phone call from Ms. Bowman in which she told him that she had been pressured by the other jurors to return a verdict that would result in a death sentence and that the verdict actually rendered was not her personal verdict. Mr. Madrid brought this to the attention of the trial court by way of an affidavit attached to appellant's motion for new trial.

Appellant complains that alleged jury misconduct tainted the verdict on punishment because of the foreman's Bible reading during deliberations. Appellant asserts that this reading was an outside influence that inappropriately impacted the verdicts of jurors Angela Bowman and Casey Guillotte, so affidavits to that effect were admissible under Rule 606(b). At the hearing on the motion for new trial, the State objected to the admission of any affidavits regarding jury deliberations, but prepared affidavits from Mr. Clinger and Ms. Guillotte should the trial court choose to admit affidavits.

Inquiring into the deliberative processes of a jury to ferret out misconduct has been prohibited

in this country, save for a few, narrow exceptions.[101]  This state currently recognizes only two

exceptions to this general rule.[102]  First, jurors may testify about their deliberations to rebut an

accusation that a juror was unqualified to serve, and second, jurors may testify about whether an

outside influence was improperly brought to bear upon their deliberations.[103]

This Court has never determined whether reference to the Bible during jury deliberations is

an outside influence.  Today we hold that it is not.

This Court first explained in *McQuarrie v. State* that an outside influence is one that

originates "from a source outside of the jury room and other than from the jurors themselves."[104]

But, as we later explained in *Colyer v. State*, this does not necessarily encompass every influence

originating from outside the physical jury deliberation room.[105]  "The 'outside influence' exception

to Rule 606(b) does not include influences or information that are unrelated to trial issues."[106]

Here, the alleged "outside influence" that appellant complains of is a scripture from the Bible

---

[101]  FED. R. EVID. 606(b)(2) ("A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict form."); TEX. R. EVID. 606(b)(2) ("A juror may testify: (A) about whether an outside influence was improperly brought to bear on any juror; or (B) to rebut a claim that a juror was not qualified to serve.").

[102]  TEX. R. EVID. 606(b)(2).

[103]  *Id*.

[104]  *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012).

[105]  *Colyer v. State*, 428 S.W.3d 117, 127 (Tex. Crim. App. 2014) (holding that a telephone call from a juror's physician that the juror's daughter was sick did not qualify as an "outside influence" for the purposes of Rule 606(b) despite the fact that it did indeed originate from a source outside the jury room).

[106]  *Id*.

that the jury foreman recommended to another juror in an effort to comfort her. While this scripture did literally come from outside the jury room, as neither the Bible nor any of its contents were ever offered into evidence, we cannot say that it meets the definition of "outside influence" this Court established in *McQuarrie*.

When a jury has before it evidence that was not offered at trial, or subject to cross-examination, a defendant's right to a fair and impartial jury may be compromised. This compromise occurs, however, only when the outside evidence or influence relates directly to a question of fact left to the jury's determination and improperly influences their verdict.

Referring to the Bible did not directly relate to a fact at issue before the jury in appellant's case, and the jury was not called upon to decide a fact issue based on anything other than the evidence properly admitted before it. Had the foreman merely recited a Bible verse from memory, we could not consider it an outside influence. Indeed, evidence of such a recitation would not have even been admissible per the constraints of Rule 606(b).[107]

The fact that the foreman in this instance referred a juror to the Bible verse instead of quoting it from memory is a distinction without a difference. Either way, there is no evidence that the biblical reference related to the facts at issue in this case, and it was therefore not an outside influence under Rule 606(b) and as interpreted by this Court in *McQuarrie* and *Colyer*.[108]

---

[107] Our analysis is guided by the 4th Circuit's analysis in *Robinson v. Polk*, where the court was presented with a factually analogous situation and determined that, because the Bible reading did not go to a fact at issue in the case, and because a juror merely quoting the Bible from memory "assuredly would not be considered an improper influence," there was no improper outside influence in violation of Rule 606(b). *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006).

[108] We are mindful of the fact that the 5th Circuit has held that the Bible can be an external influence on the jury, but the facts of that case distinguish it from this one.

Because the Bible was not an outside influence, the trial court erred when it admitted State and defense affidavits describing jury deliberations. Additionally, because the affidavits describing the inner goings-on of the jury's deliberations were improperly admitted, any live testimony to that effect would have been inadmissible under Rule 606(b) as well. Even had the affidavits been admissible, it was within the trial court's discretion to rule on a motion for new trial on affidavits without oral testimony.[109] Either way, the trial court did not abuse its discretion when it denied appellant's request for an evidentiary hearing on his motion for new trial.

When citizens are selected for jury service, the law does not ask them to set aside every personal or moral directive to which they adhere, nor will this Court do the same by holding that reference to such a directive during jury deliberations is improper. If trial attorneys are troubled by jurors who call upon such beliefs during their deliberations, this trouble is better addressed in voir dire than it is in by way of a motion for new trial.

The jury foreman's reference to his Bible in an attempt to comfort his fellow juror was not an outside influence improperly brought to bear on the jury's deliberations, and affidavits to that effect were not properly admissible under Rule 606(b). Regardless, although the trial court erred in admitting the affidavits, the trial court did not abuse its discretion when it overruled appellant's motion for new trial. Appellant's twelfth point of error is overruled.

We affirm the judgment of the trial court.

Delivered: October 28, 2015
Do Not Publish

---

[109] *Holden*, 201 S.W.3d at 763.